# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

DANIEL F. THORNTON,

   Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

   Defendant.

No. C05-1035

**ORDER**

_____

  This matter comes before the court pursuant to briefs on the merits of this application for Title II Disability Insurance Benefits under the Social Security Act. The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The court finds that the case be remanded for determination of a proper residual functional capacity assessment that properly incorporates the opinion of one of the claimant's treating sources and the claimant's subjective allegations of pain.

## I. Procedural Background

  Claimant Daniel Thornton applied for Title II social security benefits on November 15, 2001, alleging an inability to work since June 21, 2001, due to post-surgical back problems. The claimant's application was denied on January 15, 2002. The claimant filed a request for reconsideration on May 1, 2002. The request for reconsideration was also denied on July 3, 2002. The claimant filed a second application for disability benefits on November 19, 2002. The claimant's second disability application was denied on April 28, 2003. A request for reconsideration was filed through claimant's counsel on June 2, 2003. This request for reconsideration was denied on July 8, 2003. The claimant requested a

hearing by an Administrative Law Judge (hereinafter "ALJ") on August 8, 2003, which was granted. A hearing before ALJ Andrew T. Palestini was held on September 9, 2004. ALJ Palestini denied benefits. On April 21, 2005, the Appeals Council denied the claimant's request for review. Thus, ALJ Palestini's decision is the final decision of the Commissioner in this case.

## II. Factual Background

The claimant was born on October 7, 1956. (Tr. 62). He graduated high school and was in the Army National Guard. (Tr. 85). The claimant had past relevant work experience as a purchasing agent, general contractor, and, most recently, a factory worker at the 3M company. (Tr. 92). The claimant's job at 3M required him to stand for eight hours a day and entailed lifting boxes weighing 5-50 pounds, kneeling, crouching, and handling big objects eight hours a day. (Tr. 80).

The claimant visited Dr. Mark Patterson at the Gundersen Lutheran-McGregor Clinic on August 21, 2000. (Tr. 183). The claimant complained of right heel pain radiating upwards and pain around his left elbow radiating up and down the arm. (Tr. 183). The claimant showed tenderness on the lateral aspect of the elbow region and bottom of the heel, good range of motion of the neck, fingers, hands, wrists, elbow, and shoulder, and good strength and normal reflexes. (Tr. 183). Dr. Patterson recommended a tennis elbow arm band, a cushioned heel insert, and Ibuprofen as needed. (Tr. 183).

The claimant visited Dr. James A. Pearson, a back surgeon, for a consultation on October 2, 2000. (Tr. 180). Dr. Pearson noted that the claimant was having pain that radiated down his left leg, due to significant herniation at the L4-5 level. (Tr. 179). Dr. Pearson recommended the claimant perform abdominal strengthening and flexion exercises.

The claimant again saw Dr. Pearson on October 16, 2000. (Tr. 180). Dr. Pearson noted increased pain and scheduled an MRI. (Tr. 180). The claimant's MRI was done on October 21, 2000. (Tr. 235). Following his MRI, the claimant saw Dr. Pearson on

October 25, 2000. Dr. Pearson noted that the MRI showed significant herniation at the L4-5 level. Dr. Pearson recommended conservative bed rest and inactivity for two weeks. (Tr. 179).

On November 8, 2000, Dr. Pearson determined that the claimant would need surgery for lumbar exploration and decompression at the L4-5 level with probable total laminectomy. (Tr. 179). Prior to surgery, Dr. Pearson, noted that the claimant had back surgery for pain that radiated down his right leg in 1997 and 1993. (Tr. 175). Dr. Pearson also stated that the claimant experienced pain aggravation on sneezing and coughing into his left leg and showed a slightly diminished left ankle reflex. (Tr. 175). Dr. Pearson noted the claimant was unable to get pain relief from conservative measures such as exercise. (Tr. 175). The claimant demonstrated no weakness, but did have numbness in his lower extremity and a positive straight leg raise test. (Tr. 175). Dr. Pearson noted that the claimant's MRI showed a herniated disc at the L4-5 level and a bulging disc at the L5-S1 level, which was the impetus for the surgery. (Tr. 175). Dr. Pearson successfully performed the claimant's total laminectomy, lateral decompression, and disc excision on November 17, 2000. (Tr. 173).

The claimant saw Dr. Pearson for follow-up examinations on November 27, 2000 and December 27, 2000. (Tr. 179). On these occasions, Dr. Pearson noted that the claimant was bothered with some leg discomfort, which was different than what he had experienced preoperatively. (Tr. 179). Dr. Pearson also stated that the claimant's range of motion on bending was restricted due to discomfort. (Tr. 179). Dr. Pearson recommended that the claimant go back to work only for half days. (Tr. 179).

The claimant continued to work half days on the recommendation of Dr. Pearson through February 5, 2001. On that date the claimant saw Dr. Pearson for a follow-up appointment, at which time the claimant noted much improvement and Dr. Pearson released him to lift up to 25 pounds and to return to a full day of work. (Tr. 179). All restrictions were lifted by Dr. Pearson March 7, 2001. (Tr. 179).

On February 20, 2001, the claimant visited Dr. Clifford C. Smith at the Gundersen Lutheran-McGregor Clinic in McGregor, Iowa, complaining of lesions on the roof of his mouth. (Tr. 182). The claimant also mentioned that he was still having a lot of back pain after his third surgery, although it was not radiating as much to his legs. (Tr. 182).

The claimant visited Dr. Cheryl Bihn in the Physical Medicine and Rehabilitation department at the Gunderson Lutheran Hospital in La Crosse, Wisconsin on March 2, 2001. (Tr. 227). The claimant had previously seen Dr. Bihn for ongoing lower back pain following his 1988 discectomy. (Tr. 227). The claimant complained of weakness in his back and legs, increased pain at the end of the day, and difficulty sleeping. (Tr. 227). The claimant noted that he had no numbness or tingling in his legs at the time. (Tr. 227). Dr. Bihn found that the claimant had good strength in his ankle dorsiflexors and plantar flexors, trace weak knee extension on the left side, and weak lower abdominals. (Tr. 227). Dr. Bihn referred him to physical therapy and recommended abdominal strengthening and truncal stabilization. (Tr. 227). Dr. Bihn also prescribed the claimant Flexeril and recommended that the claimant try to transfer to a job which would entail less bending and lifting on a repetitive basis. (Tr. 227).

The claimant began physical therapy at Prairie Du Chien Memorial Hospital with physical therapist Nancy Key. (Tr. 198-99). Ms. Key noted that the claimant's main complaints were weakness and fatigue and pain at the end of the work day and in the morning. (Tr. 198). The claimant stated his pain level at the time was a three out of ten. (Tr. 198). The claimant exhibited pain with palpation in the lumbar musculature and lateral quadratus lumborum. (Tr. 198). His range of motion was within the functional limits, but the claimant reported forward bending increased his symptoms the most. (Tr. 198).

The claimant had six more physical therapy session between March 7 and March 27, 2001. (Tr. 200-201). Overall the claimant reported an increased ability to ambulate and increased strength. (Tr. 200).

The claimant visited Ms. Mallat for physical therapy on March 12, 2001. (Tr. 197). Ms. Mallet noted that claimant's level of function and activity had significantly increased overall, however the claimant had not been able to return to breaking horses. (Tr. 197).

Dr. Bihn was contacted by Bobby Jo Mallet, a physical therapist assistant at Prairie Du Chein Memorial Hospital on March 30, 2001. (Tr. 226). Ms. Mallet stated that the claimant had made good progress and she was going to discharge him from therapy. (Tr. 226).

At the claimant's physical therapy session with Ms. Mallat on April 5, 2001, he reported increased cervical and lower back pain, which radiated down his leg. (Tr. 191). The claimant repeated this complaint at his April 10th visit. (Tr. 191).

On April 13, 2001, the claimant saw Dr. Bihn for a follow-up appointment for his low back pain. (Tr. 226). Dr. Bihn noted that the claimant had finished physical therapy and was proceeding with a step down program. (Tr. 226). The claimant noted that he was slept much better after taking Flexeril and was having minimal lower back pain. (Tr. 226). Dr. Bihn recommended the claimant wear a back brace while at work and the claimant stated that he would discuss this with his orthopedic surgeon. (Tr. 226). Upon physical examination, Dr. Bihn noted that the claimant's gait was unremarkable, but he still exhibited trace weakness in left knee extension. (Tr. 226).

At his physical therapy visit with Ms. Mallat on April 26, 2001, the claimant reported increased pain rated a five to six out of ten for the past three days. (Tr. 190). Ms. Mallat contacted Dr. Bihn, who recommended the claimant continue his physical therapy for an additional two weeks in response to the development of increased pain in the claimant's low back radiating down his leg. (Tr. 225). In addition, Dr. Bihn prescribed Celebrex for his increased pain and recommended the claimant be placed on light duty and limit bending and twisting. (Tr. 225). Dr. Bihn also noted that if the claimant's symptoms did not improve within the next five days, she would proceed with

an MRI to ensure that the claimant had not had a recurrence of his disc herniations. (Tr. 225).

The claimant saw Ms. Key for physical therapy on April 27, 2001. (Tr. 195-96). The claimant reported a development of new symptoms, which at worst had been at a pain level of seven out of ten. (Tr. 195). The claimant noted that he had pain down his right leg and into his ankle and over his shoulder and neck on the right side. (Tr. 195). The claimant stated his pain was not constant, but occurred greater than 50% of the time. (Tr. 195). The claimant noted that he was able to walk a mile, but with decreased pace and speed. (Tr. 195). Ms. Key found that the claimant exhibited limited flexion and side-bending range of motion. (Tr. 195).

On May 7, 2001, the claimant saw Dr. Bihn for a follow-up examination regarding his recently developed increased back and leg pain. (Tr. 225). Dr. Bihn noted that she had been using conservative measures including traction and physical therapy to treat the claimant, which had not resulted in an improvement in his symptoms. (Tr. 225). Given this, Dr. Bihn decided to proceed with an MRI to evaluate the claimant's recurrent disc herniation. (Tr. 225).

The claimant underwent the MRI of his lumbar spine on May 15, 2001, ordered by Dr. Bihn. (Tr. 234). The MRI showed some degenerative disc disease, disc dehydration, disc space narrowing, and degenerative endplate. (Tr. 234). However, there was no recurrent, residual, or new disc herniation since the claimant's October 2000 MRI. (Tr. 234). The MRI also showed slight bilateral formainal stenosis, due to degenerative facet disease, and ligamentum flavum hypertrophy with slight disc bulging. (Tr. 234).

Following the MRI, the claimant saw Dr. Bihn. (Tr. 224). The claimant complained of increased back pain and right leg pain radiating down to his ankle and left leg pain down to his knee. (Tr. 224). The claimant also noted that he had a positive sneeze affect. (Tr. 224). The claimant stated that the pain seemed to lessen when he laid down and was aggravated by driving. (Tr. 224). The claimant also complained of pain

in his left scapular region. (Tr. 224). Given that the MRI showed no sign of recurrent disc herniation, Dr. Bihn recommended the claimant continue with physical therapy, including deep tissue massage/myofascial release to the left scapular muscles, continue taking Flexeril and Celebrex, and consider a neurosurgical referral or a trial on Neurontin if his symptoms worsened. (Tr. 224-25). Dr. Bihn offered the claimant pain medication, but the claimant stated he preferred to avoid it. (Tr. 224).

The claimant received physical therapy treatment on five occasions from May 24 to May 31, 2001. (Tr. 187-89). Ms. Key performed an evaluation of the claimant on May 24, 2001. (Tr. 193-94). The claimant reported pain in his left scapular and shoulder area which was far greater than the pain he was experiencing in his lower back. (Tr. 193). The claimant noted that the symptoms were worse when he was lying down or sitting and noted that his pain level ranged between a three to a six out of ten. (Tr. 193). The claimant stated that he felt his strength on his left, dominant side was decreasing, which was confirmed by a right grip test of 98 pounds and a left grip of 95 pounds. (Tr. 193). Ms. Key also noted an increase in abduction symptoms and tender inferior border and medial superior border of the left scapula and upper trapezius upon palpation. (Tr. 193). In addition, she found a slight increase in premature upper rotation of the inferior border of the left scapula. (Tr. 194).

On May 25, 2001, the claimant visited Dr. Bihn in response to an increase in pain and an inability to work. (Tr. 223). The claimant stated that his leg pain had remained the same, but his left scapular pain was significantly increased. (Tr. 223). Upon physical examination, the claimant exhibited grip strength of 100 pounds on the right and 80 pounds on the left, though the claimant is left handed. (Tr. 223). Dr. Bihn recommended continued physical therapy and massage and ultrasound treatment when the claimant's symptoms had improved. (Tr. 223). Dr. Bihn also offered the option of trigger point injections, but the claimant preferred to try conservative measures first and stated that he would return for trigger point injections if his symptoms had not improved within two

weeks. (Tr. 223). Dr. Bihn told the claimant to take off work from May 23rd to May 28th. (Tr. 223). After that, she limited the claimant to sitting one to two hours per day, standing five to eight hours per day, changing positions as needed, and instructed him to avoid repetitive over head and chest height activities. (Tr. 223-24). However, Dr. Bihn stated that these restrictions were only temporary and were to be in place for two weeks until the claimant's next appointment. (Tr. 224).

The claimant saw Dr. Bihn on June 13, 2001, for his follow-up appointment. (Tr. 221-22). The claimant noted that he was no longer having pain with overhead activities or repetitive activates after physical therapy and deep tissue massage. (Tr. 221). However, the claimant noted that he occasionally experienced discomfort after driving for a long period of time. (Tr. 221). The claimant's physical therapist sent Dr. Bihn a note in which she outlined concerns about the claimant's left elbow. (Tr. 221). The claimant stated that he had chronic irritation of his left elbow with numbness and tingling radiating into his fourth and fifth digits. (Tr. 221). The claimant noted that his low back and leg symptoms were significantly improved and he had been doing repetitive 35-pound weight lifting at work without difficulty. (Tr. 221). The claimant stated that he was switching positions at 3M to a process operator which would entail lifting 50 pounds or greater with the assistance of another, occasional lifting in the light to medium physical capacity, and would allow him more opportunity to sit down than his current job. (Tr. 222). Upon physical examination, Dr. Bihn noted that the claimant exhibited positive Tinel's at the left wrist with paresthesias shooting into the hand and noted suspected carpal tunnel and ulnar nerve irritation at the elbow. (Tr. 222). Dr. Bihn recommended continued physical therapy treatment for his left scapular pain for an additional two weeks, followed by a step down program. (Tr. 222). As to his hand paresthesias, Dr. Bihn suggested and EMG nerve conduction study, however, the claimant noted that his symptoms were chronic and unchanging, and did not wish to proceed with treatment. (Tr. 222). With respect to the claimant's low back pain, Dr. Bihn reviewed all the work requirements of his new job and

released him back to work unrestricted. (Tr. 222). Dr. Bihn discussed with the claimant a possible referral to Vocational Rehab for career counseling and a possible vocational change, but the claimant expressed a desire to attempt his new job. (Tr. 222).

On June 20, 2001, the claimant was evaluated by Ms. Key. (Tr. 192). The claimant noted that his visit with Dr. Bihn on June 13th was one of the best days he had had in a long time. (Tr. 192). However, since then his pain down his triceps had become worse and his left arm and fingers were completely numb. (Tr. 192). Ms. Key found that the claimant's rotation toward the left and side bending toward the left was limited by greater than 50%. (Tr. 192). A grip test also showed that the claimant's grip on the right side was 85 pounds and his grip on the left was 75 pounds, a significant decrease from the May 24th test. (Tr. 192).

Ms. Key contacted Dr. Bihn to discuss the claimant's left arm pain, which had increased over the past few days. (Tr. 221). Dr. Bihn noted that the claimant's left arm pain was different from his chronic paresthesias and included pain radiating from his neck down his lateral shoulder region down the posterior aspect of the arm. (Tr. 221). Dr. Bihn expressed concern that the claimant had experienced a disc herniation in the cervical spine and scheduled an MRI for June 22, 2001. (Tr. 221).

The MRI showed C6-7 disc herniation on the left with radicular symptoms. (Tr. 220, 233). As a result, Dr. Bihn instructed the claimant to take off work for two to three weeks and begin traction with his physical therapist. (Tr. 220). She also prescribed a Medrol Dosepak and suggested cervical epidural steroid injections, which the claimant declined because he had had difficulty with lumbar injections in the past. (Tr. 220).

The claimant continued physical therapy from June 25 through July 5, 2001. (Tr. 185-86). The claimant reported increased symptoms, which were aggravated by sitting or standing. (Tr. 186). On July 5, 2001, Ms. Mallat noted that the claimant had received no relief from his physical therapy sessions and she attempted to contact Dr. Bihn to inform her of the claimant's lack of progress. (Tr. 185).

The claimant contacted Dr. Bihn on July 12, 2001 to update her on his symptoms. (Tr. 219). The claimant noted that he had continued neck and arm symptoms and had found no relief with the traction. (Tr. 219). However, the claimant noted that he did experience some relief from the Medrol Dosepak. (Tr. 219). Dr. Bihn discussed the possibility of a surgery referral, which the claimant declined, preferring to try more conservative measures before undergoing another surgery. (Tr. 219). Dr. Bihn then suggested cervical epidural steroid injections under fluoroscopy as an alternative to lumbar epidural steroid injections. (Tr. 219).

On July 16, 2001, the claimant had a follow-up appointment with Dr. Bihn. (Tr. 218). Dr. Bihn scheduled cervical epidural steroid injections and tentatively scheduled an appointment with neurosurgeon Dr. Jerry Davis if the injections did not provide relief. (Tr. 219). Dr. Bihn instructed the claimant to continue not working, and noted that ultimately they would need to look into long-term vocational changes. (Tr. 219).

The claimant underwent cervical epidural steroid injections on July 26, 2001. (Tr. 218, 233). Dr. Felix Fernandes performed fluoroscopy guidance to manage the claimant's pain. (Tr. 233). Dr. Fernandes suggested the claimant have the procedure repeated in one month and told him to talk to his employer about trying to make changes in his work environment in order to allow him to recover from his injury. (Tr. 218).

On August 7, 2001, Dr. Bihn performed an EMG/nerve conduction study on the claimant. (Tr. 217). The study showed dernervation in the claimant's left triceps, which, it was noted, could represent left C7 radiculopathy and bilateral distal median neuropathies at the wrist consistent with carpal tunnel syndrome, moderate on the left and mild on the right. (Tr. 217). The claimant noted that he had experienced no improvement following his epidural injections. (Tr. 216). Dr. Bihn instructed the claimant to remain off work until his evaluation by neurosurgeon, Dr. Davis. (Tr. 216).

The claimant saw Dr. Davis on August 23, 2001. (Tr. 215). Dr. Davis opined that

it was a C7 radiculopathy, not carpal tunnel, that was causing his symptoms, and suggested a C6-7 anterior cervical discectomy and fusion as the claimant had failed conservative measures and his symptoms were worsening. (Tr. 215).

On September 19, 2001, Dr. Davis performed a C6-7 anterior cervical discectomy. (Tr. 229-30). The claimant was seen by Dr. Davis on October 3, 2001 for a post-surgical follow-up examination. (Tr. 213). The claimant stated that his left arm pain was completely gone, but he still had occasional numbness and tingling in his right fourth and fifth fingers. (Tr. 213). The claimant also noted that he was able to walk four to five times per day for one-half mile. (Tr. 213). Dr. Davis limited the claimant to lifting ten pounds, no overhead lifting, no pushing, no pulling, no weight bearing across the head, neck, and shoulders, and no repetitive motion with his arms. (Tr. 213). Dr. Davis recommended that the claimant continue walking, gradually increasing his distance, begin neck and shoulder exercises, and use heat to treat his stiffness. (Tr. 213-14). The claimant was also instructed to remain off work. (Tr. 214).

The claimant visited Dr. Davis for a follow-up appointment on October 30, 2001. (Tr. 212-13). The claimant complained of posterior right-side pain in his neck, which extended up to his head causing headaches and also extended inferiorly into his back over the top of his right shoulder. (Tr. 212). This pain caused the claimant to have a decreased range of motion in his neck. (Tr. 213). However, the claimant noted that his preoperative symptoms in his left arm were completely resolved. (Tr. 212). Dr. Davis noted his concern for the claimant's neck pain and stated he wanted to follow through with complete fusion. (Tr. 213). Dr. Davis stated that "at some point I think we will need to have the Physical Medicine Department readdress his disability status, however, at this time we will continue his total disability." (Tr. 213). Dr. Davis ordered an x-ray of the claimant's cervical spine on the same day, which showed that the claimants cervical spine alignment was normal. (Tr. 232).

The claimant applied for disability insurance benefits on November 15, 2001,

alleging an inability to work because of his condition on June 21, 2001. (Tr. 62). The claimant stated that his prior disc surgery and back problems limited his ability to work because his lifting capacity and movements were restricted. (Tr. 79). The claimant noted that his injuries first began to bother him on June 7, 2001 and he stopped working on June 21, 2001, per doctor's orders. (Tr. 79).

On November 27, 2001, the claimant saw Dr. Davis. (Tr. 211). Dr. Davis found that the claimant had better range of motion in his neck and less neck pain and headaches. (Tr. 211). Another x-ray was taken of the claimant's cervical spine, which Dr. Davis stated showed good fusion at the C6-7 levels. (Tr. 211, 232). Dr. Davis suggested the claimant return to seeing Dr. Bihn in the Physical Medicine and Rehabilitation department due to issues regarding disability. (Tr. 211). Dr. Davis opined that the claimant had developed spine disease in two locations in his cervical and lumbar region, and that he thought disability needed to be addressed. (Tr. 211).

Dr. Bihn examined the claimant on November 29, 2001, after the referral from Dr. Davis. (Tr. 210). The claimant stated that he had been off work and was on a long term disability policy for 18 months, which required him to apply for Social Security Disability. (Tr. 210). The claimant also noted that he had been referred to Occupational Therapy and was seeing Dale Wirth. (Tr. 210). Dr. Bihn stated that the claimant was currently in a light to medium physical capacity and had been working on his horse farm, which entailed lifting feed buckets weighing approximately 20 pounds, throwing hay bales weighing approximately 60 pounds. (Tr. 210). Dr. Bihn suggested limiting his lifting to 35 pounds, but the claimant noted that there was work that had to be done on the farm and he was the only one there who could do it. (Tr. 210). Physically, the claimant showed full range of motion in his left shoulder, good strength in his triceps and wrist flexors, moderate limitation in neck flexion and mild limitation in neck extension. (Tr. 210). Dr. Bihn recommended the claimant continue with stabilization exercises, limit his activity to the light to medium range on the farm, and resume taking Celebrex. (Tr. 210).

Dr. Bihn suggested the claimant change vocations and the claimant stated he and his wife were looking into starting a Bed and Breakfast.  (Tr. 210).

The claimant was examined at the Physical Medicine and Rehabilitation clinic on December 13, 2001 Dr. Kevin Boland.  (Tr. 209-10).  Dr. Boland noted that the claimant had been stretching daily and walked at least one mile every day.  (Tr. 209).  The claimant stated that he had been working with Dale Wirth in Occupational Therapy on Work Hardening and hoped that long-term restrictions would result from that.  (Tr. 209).  The claimant stated his pain was a three to four out of ten on average and noted that he had trouble sleeping because he had difficulty finding a comfortable position.  (Tr. 209).

The claimant filled out a personal pain/fatigue questionnaire in conjunction with his application for social security benefits on December 14, 2001, in which he noted that he suffered from a dull to aching pain in his right shoulder and upper right side of his back, suffered headaches that ranged from mild to migraines, and suffered from dull to sharp pains in his lower back, which exacerbated to radiating pain down his leg into his foot when he sat for along period of time.  (Tr. 103).  The claimant stated that the pain became worse after standing for more than 15 minutes, sitting for more than 30 to 40 minutes, and it caused him to awake at night after three to five hours of sleep.  (Tr. 103).  The claimant noted that he had back pain every day (worse in the mornings), which prevented him for accomplishing what he needed to do.  (Tr. 103).  The claimant noted that he had lower back surgery for disc problems in November 2000 and a related neck surgery in September 2001.  (Tr. 104).  The claimant also stated that when he did exercises to strengthen his back muscles, it helped with the pain.  (Tr. 104).  The claimant further stated that his pain limited his lifting capacity, his ability to lean or bend forward, and the length of time he could stand.  (Tr. 104).  He explained that he had not been able to work or ride his horses for over a year and was limited in the duration of time he was able to spend on household chores or hobbies.  (Tr. 104).

The claimant also completed a daily activities questionnaire in relation to his

application for disability benefits on December 14, 2001. (Tr. 107-10). The claimant noted that he regularly vacuumed, took out the trash, did home repairs, repaired his car, washed his car, and mowed the lawn. (Tr. 107). He stated he rarely did the dishes, changed sheets, repaired appliances, raked leaves, and did garden work. (Tr. 107). He further explained that his inability to lift and pick-up objects hindered his ability to do his regular chores and that it took him three to four times longer to complete tasks than before his pain began. (Tr. 107). The claimant also noted that he prepared meals at home two to three times per week, did some grocery shopping, drove on most days, helped with taking care of pets, and participated in social activities weekly. (Tr. 109).

On December 26, 2001, the claimant completed a migraine headache questionnaire, in which he noted that he experienced migraines three to four times per week, lasting for four to seven hours, which would restrict all activity and cause a sensitivity to light and sound. (Tr. 101). He noted that he took no medication because it did not help the problem and his only relief came from laying down and resting. (Tr. 102).

The claimant's wife, Denise Thornton, completed a third party migraine headache questionnaire on January 3, 2002. (Tr. 112-13). Ms. Thornton noted that the claimant's headaches disabled him until they passed and caused nausea, sensitivity to light and sound, and severe pain. (Tr. 112). She noted that the claimant's surgeon stated that his headaches could be stemming from his back problems. (Tr. 112). Ms. Thornton stated that the claimant's headaches occurred twice a week and lasted for four to six hours, in which time the claimant was unable to do anything but lay down and try to sleep. (Tr. 112). She stated that the claimant took Excedrin Migraine, but the medicine did not give him any immediate relief. (Tr. 113).

On January 3, 2002, Kristin Abrahamson at Gundersen Lutheran's Rehabilitation Services Industrial Rehabilitation/Occupational Therapy Center ("IRC") completed a limitation evaluation regarding the claimant. (Tr. 236-37). Ms. Abrahamson noted that the claimant had attended appointments at the IRC on November 15, 26, and 29, 2001,

December 13, 2001, and January 3, 2002. (Tr. 236). She noted that the claimant had demonstrated the ability to perform low back exercises and whole body range of motion exercises. (Tr. 236). She stated that his lifting abilities had increased by ten pounds from floor and waist levels, his push/pull strength had doubled, and his grip strength had increased ten pounds in each hand. (Tr. 236). However, Ms. Abrahamson stated that he claimant continued to have difficulty with postural activities that required forward bending, crouching/stooping/squatting, and overhead activities and his ability to abduct/adduct lower extremities was significantly limited. (Tr. 236). She noted that the claimant's physical abilities appeared to have reached a plateau and he tended to have setbacks in which he experienced increased low back and cervical pain. (Tr. 236). Ms. Abrahamson stated that the claimant did not meet the essential job functions of a machine operator or line worker at 3M. (Tr. 236). Ms. Abrahamson prescribed the following limitations for the claimant: (1) floor to waist lifting limited to 30 pounds 1-5% of the day, 20 pounds 6-33% of the day, 10 pounds 34-66% of the day, and 5 pounds 67-100% of the day; (2) waist to overhead lifting 20 pounds 1-5% of the day, 15 pounds 6-33% of the day, 10 pounds 34-66% of the day, and 5 pounds 67-100% of the day; (3) horizontal lifting 40 pounds 1-5% of the day, 30 pounds 6-33% of the day, 20 pounds 34-66% of the day, and 10 pounds 67-100% of the day; (4) pushing and pulling 140 pounds 1-5% of the day, 100 pounds 6-33% of the day, 70 pounds 34-66% of the day, and 35 pounds 67-100% of the day; (5) right and left carrying 30 pounds 1-5% of the day, 20 pounds 6-33% of the day, 10 pounds 34-66% of the day, and 5 pounds 67-100% of the day; (6) front carry 35 pounds 1-5% of the day, 25 pounds 6-33% of the day, 15 pounds 34-66% of the day, and 10 pounds 67-100% of the day; (7) left and right hand grip 100 pounds 1-5% of the day, 75 pounds 6-33% of the day, 50 pounds 34-66% of the day, and 25 pounds 67-100% of the day. (Tr. 236). She limited elevated work, forward bending/sitting, rotation sitting, rotation standing, and repetitive squatting to 1-5% of the day. (Tr. 236-37). She limited crawling, kneeling, crouching, sitting, standing, step ladder climbing, and balancing to 6-33% of the day.

(Tr. 237). Finally, she limited stair climbing to 34-66% of the day and walking and right and left upper extremity coordination to 67-100% of the day. (Tr. 237).

On January 9, 2002, the claimant visited Dr. K. Ali at the Gundersen Lutheran-McGregor Clinic complaining of severe headaches, especially since his back surgery in September 2001. (Tr. 250). The claimant noted that his headaches had become more frequent and severe and were accompanied by nausea, blurred vision, and sensitivity to bright lights. (Tr 250).

The claimant's initial application for disability was denied on January 15, 2002. (Tr. 36). The disability examiner's determination was based, in part, on an RFC assessment completed by Dr. J.D. Wilson on the same date. (Tr. 36, 238). Dr. Wilson opined that the claimant could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for six hours in an 8-hour workday, sit for about six hours in an eight-hour workday, with unlimited pushing and pulling. (Tr. 239). Dr. Wilson explained that these limitations were due to the claimant's March 9, 2001 report that he was working full time, lifting 50 pounds, and walking about a mile and a half per day; the claimant's May 7, 2001 complaint of increased right leg pain and left leg pain; the May 15, 2001 MRI showing flight bilateral formainal stenosis at L4-5; the claimant's May 24, 2001 complaint of left shoulder pain, which kept him from working; the claimant's June 20, 2001 complaint of left arm numbness; the June 22, 2001 MRI, which indicated left C6-7 disc herniation which affected the nerve root; the claimant's September 19, 2001 discectomy and fusion; the November 27, 2001 MRI, which showed stable alignment and no surgical complications; the claimant's November 28, 2001 report that he was lifting 20 pounds buckets and throwing 60 pound bales of hay; the claimant's November 29, 2001 tests which showed full range of motion of the left shoulder, good strength in the triceps and wrists, and mild to moderate limited range of motion in the neck; the fact that the claimant's carpal tunnel and arm symptoms appeared to be completely resolved as of November 29, 2001; and a lack of a diagnosis of migraines. (Tr. 240).

As to the claimant's postural limitations, Dr. Wilson limited the claimant to occasional climbing, balancing, stooping, kneeling, crouching, and crawling due to his three lumbar spine surgeries and one cervical spine surgery. (Tr. 240). Dr. Wilson also noted that although the claimant stated on his December 14, 2001 personal pain/fatigue questionnaire that he could not lift like he used to, the claimant reported to his physician on November 29, 2001 he was able to lift 20 pounds buckets and throw 60 pound hay bales. (Tr. 242). Dr. Wilson also noted that the claimant reported on December 13, 2001 that he could walk at least a mile everyday, but stated on his personal pain/fatigue questionnaire that he could walk for a couple of miles. (Tr. 242). In addition, Dr. Wilson noted that the claimant took no pain medication for his back and stated that medication did not help his headaches. (Tr. 243). Dr. Wilson determined that the claimant was partially credible because he has a history of four back surgeries and had sought frequent treatment, including physical therapy. (Tr. 243). Moreover, Dr. Wilson stated that the claimant had continued to be seen for follow-up appointments, but had been non-compliant with his doctor's weight lifting restrictions. (Tr. 243).

In his decision, the examiner noted that while the claimant was having back problems following back surgeries, he had responded well to physical therapy. (Tr. 40). The examiner found that the claimant had good use of his back, arms, and legs and showed no evidence of nerve damage or muscle wasting. (Tr. 40). The examiner also noted that while medical evidence indicated that the claimant had headaches, they had not required hospitalizations or frequent treatment. (Tr. 40). Finally, the examiner stated that although the claimant could not perform heavy lifting, he retained the capacity to perform work he had done in the past as a purchasing agent. (Tr. 40).

On January 18, 2002, the claimant presented to Dr. Bihn for a follow-up from his evaluation by IRC. (Tr. 249). Dr. Bihn determined that the claimant was functioning in the light medium physical capacity and could lift 30 pounds maximum. (Tr. 249). She found that the claimant had significant limitations in flexibility and positioning which

would limit him to rare elevated work, rare forward bending and sitting, rare forward bending and standing, rare rotational sitting, rare rotational standing, and rare repetitive squatting. (Tr. 249). Dr. Bihn also found that the claimant could only sit and stand occasionally. (Tr. 249). Dr. Bihn discussed with the claimant his plan of action regarding his possible employment at 3M and informed the claimant she would be leaving the Gundersen-Lutheran Clinic and would transfer him to Dr. Evan Nelson. (Tr. 249). The claimant told Dr. Bihn that he would give 3M a copy of his limitation evaluation and would await their decision. (Tr. 249). The claimant informed Dr. Bihn that he had applied for social security disability benefits. (Tr. 249). Dr. Bihn told the claimant that she was most concerned about the claimant's functional limitations due to his limited forward bending and twisting. (Tr. 249).

The claimant visited Dr. Clifford C. Smith at the Gunderson Lutheran-McGregor Clinic on January 29, 2002. (Tr. 247). The claimant had complained of headaches since September 1, 2001, which were associated with nausea, visual disturbances, and intolerance of bright light. (Tr. 247). Dr. Smith consulted a radiologist who suggested an MRI. (Tr. 247). An MRI was taken of the claimant's head on February 2, 2002, which came back negative. (Tr. 248).

The claimant filed a request for reconsideration of his disability determination on May 1, 2002. (Tr. 117). The claimant stated that Dr. Bihn had placed him on very limiting restrictions of his weight capacity and flexibility and position and, because of this, his employer had notified him that there was no position that could accommodate his limitations. (Tr. 44-46, 114).

The claimant's reconsideration request was denied on July 3, 2002. (Tr. 37). The determination was based on the RFC assessment completed by social security program physician Dr. Claude H. Koons on July 3, 2002. (Tr. 37). The examiner noted that while the claimant was somewhat limited in his ability to function, he was able to stand and walk without assistance and his strength and reflexes were within acceptable limits. (Tr. 47).

Thus, the examiner determined that the claimant could return to his past work experience as a purchasing agent. (Tr. 47). Subsequent to this reconsideration denial, the claimant did not file a request for a hearing in front of an ALJ. (Tr. 129).

On June 20, 2002, the claimant saw Dr. Smith complaining of right ear problems. (Tr. 245). Dr. Smith prescribed Cortisporin. (Tr. 245).

Dr. Smith filed a noted in the claimant's file on October 25, 2002, which stated that the claimant was extremely incapacitated as a result of his surgeries. (Tr. 245). Therefore, Dr. Smith determined that the claimant would be unable to perform any type of work at 3M and completed some forms to that extent. (Tr. 245). On a continuance of disability report for the claimant's insurance company, Dr. Smith stated that he had treated the claimant on June 20, 2002, May 15, 2002, and May 8, 2002. (Tr. 251). He stated that he had limited the claimant not to lift more than 30 pounds, to avoid bending, twisting, crawling, kneeling, or crouching. (Tr. 251). In the blank where Dr. Smith was asked to fill out what date the claimant would be able to return to part-time work, Dr. Smith wrote that the claimant was unable to return. (Tr. 251). Dr. Smith's response to when the claimant would be able to return to full-time work was the same -- unable to return. (Tr. 251).

The claimant filed a second application for disability insurance benefits on November 19, 2002, alleging an inability to work due to four disc surgeries and back problems. (Tr. 119-26). The claimant restated that his condition first began to bother him in May 1981, but became unable to work on June 21, 2001, when his doctor ordered him to stop working. (Tr. 119). The claimant explained that before becoming completely unable to work, he went from a twelve-hour shift to an eight-hour shift, stopped working overtime, and changed jobs several times in an attempt to prevent further back surgeries. (Tr. 119). The claimant noted that his back had deteriorated over the years and his doctors had advised him not to go back to work as his disc problems would continue indefinitely.

(Tr. 126).  The claimant also noted that he has had too many back surgeries and to have any more would put him at great risk.  (Tr. 126).

An updated personal pain/fatigue questionnaire was completed by the plaintiff on February 26, 2003.  (Tr. 136-39).  The claimant explained that he had three surgeries on the discs in his lower back and one in his neck.  (Tr. 136).  The claimant stated that he had been diagnosed with degenerative disc disease.  (Tr. 136).  He stated that his pain was aching to severe, depending on his activities, and located in his lower back, radiating down this leg, and in his cervical area, affecting his arms.  (Tr. 136).  He noted that his pain was worse when he was more active and was exacerbated by bending, lifting, sitting too long, riding in a vehicle for a length of time, and sleeping on a soft mattress.  (Tr. 136).  The claimant stated that his pain was moderate on most days, worse in the morning and evening, but could be severe for a five to ten day period which prevented him from doing anything from bending down to tie his shoes or walking upright.  (Tr. 136).  The claimant noted that he was taking Ultram, Aleve, Ibuprofin, and Tylenol to "take the edge off the pain."  (Tr. 137).  The claimant stated that exercise and walking helped give him more support and flexibility, but he had reached the maximum benefit that physical therapy could offer him.  (Tr. 137).  The claimant explained that he went through a rehabilitation program at LaCrosse Lutheran Hospital and his doctor had advised him not to return to work because the chance of herniating or rupturing a disc was great.  (Tr. 137).  The claimant noted that his doctor had given him strict restrictions on lifting, bending, and twisting.  (Tr. 137).  The claimant further noted that he had injured his back at his last three jobs, which resulted in three surgeries.  (Tr. 137).  He stated that his doctors told him that if he did not change his lifestyle and continued to injure his back, he could end up in a wheelchair.  (Tr. 137).  The claimant also noted that he could not do anything that required his arms at chest level or above.  (Tr. 138).  The claimant stated that he was able to help with the dishes, light house cleaning, and feed and water the animals.  (Tr. 139). He also stated that he was able to drive short distances to run errands and mow the yard

with a riding lawnmower. However, he noted that he must lay to rest two to three times per day. (Tr. 139).

Dr. Smith sent a letter to Gerald Hill, a disability examiner with the Disability Determination Service Bureau, on March 4, 2003. (Tr. 252). In his letter, Dr. Smith stated that the claimant was essentially completely disabled after four lumbar spine surgeries and one cervical spine surgery. (Tr. 252). Dr. Smith noted that the claimant was in constant back pain and also suffered from pain in his head and neck and radiating from his back down into his legs. (Tr. 252). Dr. Smith also stated that the claimant lost his balance at times. (Tr. 252). Dr. Smith stated that it was his strong recommendation that the claimant be continued on Social Security Disability. (Tr. 252).

The claimant's second disability application was denied on April 28, 2003. (Tr. 38). The determination of the disability examiner was based, in part on the RFC assessment completed by Dr. Koons on March 23, 2003. (Tr. 38). The examiner found that the claimant had good use of his arms and legs and did not required an assistance device to walk. (Tr. 50). The examiner found that the claimant was able to care for himself and could think and act in his best interest. (Tr. 50). Thus, the examiner determined that the claimant was still able to perform the job of a purchasing agent. (Tr. 50).

A request for reconsideration was filed by claimant's counsel, Allen Hein on June 2, 2003. (Tr. 143). Mr. Hein stated that the claimant lived with pain all the time, but inactivity had helped pain control. (Tr. 142). Mr. Hein noted the January 3, 2002 RFC assessment, which limited the claimant to forward bending sitting or standing to 1-5% of the workday, would preclude sedentary or light exertion. (Tr. 142). Mr. Hein stated that the degree of the claimant's pain was not considered in the program doctor's RFC, indicating the claimant could perform light work. (Tr. 142). Mr. Hein also noted that the claimant had some residual problems with his arm, in which any repetitive use of his left hand would cause it to go numb (the claimant is left-handed). (Tr. 142). Mr. Hein stated

that the claimant was able to care for his personal needs, but got up two to three times a night due to back pain. (Tr. 144). Mr. Hein also noted that the claimant had experienced several life changes due to his back pain, including selling his farm. (Tr. 144). Finally, Mr. Hein stated that the claimant must remain in bed half the day on some days and is unable to sit still due to his pain. (Tr. 144).

A third personal pain/fatigue questionnaire and daily activities questionnaire were completed by the claimant on June 29, 2003. (Tr. 148-55). In general, the claimant restated his previous limitations. The claimant stated that he was taking Prilosec and Celebrex daily and Ultram as needed, because it made him light headed and unable to think clearly or concentrate. (Tr. 149). The claimant noted that he would like to return to work and had gone to rehabilitation with that goal. (Tr. 149). The claimant noted that he had began experiencing difficulty concentrating due to his pain (a change since his February 26th questionnaire). (Tr. 150). He also noted that there were times when he was bedridden and medicine would not help. (Tr. 150). Since his February 26th questionnaire, the claimant was preparing meals once a day and his wife was doing most of the shopping. (Tr. 153).

The claimant's June 2nd reconsideration application was denied on July 8, 2003. (Tr. 39). The disability examiner's determination was based, in part, on the RFC assessment completed by Dr. Claude H. Koons on July 7, 2003. (Tr. 39). Dr. Koons outlined the following limitations for the claimant: (1) occasionally lift 20 pounds maximum; (2) frequently lift 10 pounds maximum; (3) stand and/or walk for a total of about six hours in an eight-hour workday; (4) sit for a total of about six hours in an 8-hour workday; (5) push/pull unlimited; (6) avoid ladders, ropes, and scaffolds; (7) occasionally balance, stoop, and kneel; (8) rarely crouch or crawl; (9) occasionally limited overhead reaching; (10) avoid concentrated exposure to hazards such as machinery and heights. (Tr. 255-58). Dr. Koons noted that the claimant's treating source (Dr. Smith) stated that the claimant was disabled, but there was no evidence that the claimant's treating source

saw him from October 2002 to July 2003. Dr. Koons stated that the claimant was able to help his wife with household chores, feed his animals, drive short distances, and walk up to one mile at a time, which was considerably fewer activities than he stated he was able to engage in as indicated in his first disability application in 2002. However, the claimant's stated pain and discomfort had not changed during that period. (Tr. 262). Dr. Koons also noted that although the claimant was unable to find employment with 3M, the RFC indicates that he was capable of sedentary to light work. (Tr. 262).

In his determination to deny benefits, the examiner found that the claimant had adequate motion in his back and legs, showed no evidence of nerve damage, and was able to walk independently. (Tr. 54). The examiner also found that there was no evidence that the claimant was experiencing frequent or severe headaches which would interfere with his ability to function on a daily basis. (Tr. 54). The examiner opined that the claimant should avoid work that involved heavy lifting, but found that the claimant was still able to perform his past job as a purchasing agent. (Tr. 54).

The claimant visited the Mayo Clinic in Rochester, Minnesota on September 3, 2002 on a referral from Dr. Smith. (Tr. 265). While there, he was examined by Dr. Cari A. Eggert. (Tr. 265). Dr. Eggert noted that the claimant ambulated stiffly with decreased truncal motion and a mild decrease in arm swing bilaterally. (Tr. 265). The claimant exhibited weakness in his left finger extensors and left toe extensors, exhibited pain resistance in his wrist and finger extension, showed limited flexion to 50 degrees and limited extension in the left lumbosacral junction region. (Tr. 266). Dr. Eggert stated that, after a review of all the claimant's previous vocational history, there did not appear to be any jobs that he would be able to complete without exacerbation of symptoms. (Tr. 266). Thus, Dr. Eggert determined that the claimant should be considered totally disabled for all activities. (Tr. 266). Dr. Eggert limited the claimant to lifting a maximum of 10 pounds, no prolonged sitting, a necessity to alternate tasks and change positions as needed, no repetitive bending or twisting, no crawling or climbing, and no work

environment with uneven surfaces. (Tr. 266). Dr. Eggert diagnosed the claimant with chronic low back and left lower extremity pain, secondary to his back surgeries, bilateral/lateral epicondylitis, and left hip pain, likely early osteoarthritis. (Tr. 269).

The claimant again visited Dr. Eggert at the Mayo Clinic on March 12, 2004. (Tr. 270). Dr. Eggert noted that the claimant stated he was experiencing the "same old pain", however the intensity of the pain had worsened. (Tr. 270). The claimant stated that he experienced a sharp pain, originating in the lower back, radiating through the buttock, down the posterior left leg, and into the foot. (Tr. 270). The claimant also complained of worsened neck pain, which lead to headaches. (Tr. 270). Finally, the claimant noted elbow and hip pain. (Tr. 270). Again, Dr. Eggert found weakness in the claimant's fingers and toes and deceased range of motion in his lower back, cervical spine, and hip. (Tr. 271). The claimant exhibited a positive straight leg raise, which was not present during the September 2003 examination. (Tr. 271). Dr. Eggert recommended initiating a core strengthening physical therapy program and a TENS trial. (Tr. 271). Dr. Eggert provided the claimant with a prescription for physical therapy. (Tr. 271).

The claimant was examined by Dr. Eggert on November 8, 2004. (Tr. 287-89). The claimant stated that since he last saw Dr. Eggert in March, his symptoms in his back, bilateral lower extremity, neck, and upper extremity had worsened. (Tr. 288). The claimant stated that his pain was usually between a five and seven out of ten and constant. (Tr. 288). Upon examination, Dr. Eggert found slightly diminished reflexes in the left biceps and brachial radialis, a positive straight leg raise at 45 degrees, and a positive chair lift test. (Tr. 289). Dr. Eggert decided to begin a trial of nortriptyline at bedtime for pain and sleep disturbance. (Tr. 289). Dr. Eggert again maintained that there was absolutely no job description that would be able to accommodate all of the claimant's limitations and that the claimant was totally disabled for all occupations. (Tr. 289).

An MRI was taken of the claimant's lumbar spine and cervical spine at the request of Dr. Eggert on November 11, 2004. (Tr. 291). The claimant exhibited degenerative

disease at L4 lumbar spine, but no other post-operative complications or disc herniations. (Tr. 291). On his cervical MRI, the claimant showed posterior disc bulge osteophyte, which slightly flattened the left frontal margin of the cervical chord. (Tr. 291). After receiving these results, Dr. Eggert initiated a comprehensive chronic pain management program for the claimant, which included an increase in his nortriptyline, with an ultimate goal of 150 mg at bedtime or a resolution of symptoms. (Tr. 286). As for his neck pain, Dr. Eggert recommended continued physical therapy and prescribed Lidoderm patches to deal with the pain. (Tr. 286). For the claimant's right hip osteoarthritis, Dr. Eggert suggested the claimant use a cane. (Tr. 286).

On referral from Dr. Eggert, the claimant saw Dr. Stephen Porter for an evaluation of possible dyslexia on November 16, 2004. (Tr. 283-85). Dr. Porter found that the claimant showed deficiencies in areas consistent with a diagnosis of adult dyslexia and suggested that it would be difficult for the claimant to perform sedentary work because he would have difficulty keeping up with reading and processing. (Tr. 285). Dr. Porter suggested the best option would be self-employment. (Tr. 285).

On November 18, 2004 the claimant saw Dr. Kevin Boland in the physical medicine and rehabilitation department of Gunderson Lutheran. (Tr. 280-83). Dr. Boland noted that the claimant had reported pain of three to four out of ten the last time he saw him in December 2001, but was now complaining of pain of five to six out of ten on an average day and up to eight out of ten on his worst day. (Tr. 281). Dr. Boland also noted that the claimant had sold his hobby farm. (Tr. 281). An EMG surface scan was performed, in which the claimant showed normal tone in the trapezius muscles, with mild elevations on the cervical paraspinal muscle. (Tr. 282).

Dr. Eggert noted on December 10, 2004, that she discussed with the claimant his progress in physical therapy. (Tr. 279). The claimant stated that he had been performing his exercises at home and was given a cervical thoracic stabilization program and stretches for the bilateral lateral epicondylitis. (Tr. 279). The claimant had also began walking with

a cane which he used for long distances in response to his hip osteoarthritis. (Tr. 279). The claimant reported that his symptoms were stable. (Tr. 280). Dr. Eggert suggested increasing his nortriptyline to 50 mg and icing the lateral epicondyles twice daily. (Tr. 280).

A hearing was held before ALJ Andrew T. Palestini on September 9, 2004 to determine the claimant's disability status. (Tr. 294). At the hearing, the ALJ first heard testimony from the claimant. (Tr. 295-308). The claimant testified that he could not work after June 21, 2001 and any subsequent income came from his short-term disability insurance from 3M, the sale of livestock from his farm, and a horse-boarding operation he and his wife ran until August 2003. (Tr. 295-96, 307). The claimant also stated that he was in the process of selling his farmland and horses. (Tr. 296, 307).

The claimant explained that his pain occurred because of two main sources. (Tr. 296). First, the claimant testified that due to his neck surgery on September 19, 2001, he had residual pain in his neck, shoulder, and upper back, however, the claimant did note that the surgery remedied his left arm pain. (Tr. 296-97). The claimant stated that he also experienced a loss of mobility in his neck, which caused him to have problems looking up or down and turning from side to side. (Tr. 298). The claimant testified that his biggest symptom was neck fatigue. (Tr. 298). The claimant also testified that, as a result of his neck injury, he experienced extreme headaches. (Tr. 298). However, he noted that these headaches had improved since Winter 2003. (Tr. 298).

The claimant testified that his lower back pain had caused him to have three surgeries throughout the 1990s. (Tr. 299). The claimant testified that he was able to go back to work after each surgery, but he was in constant pain and forced to quit after his final surgery in 2001. (Tr. 300).

The claimant testified that he was in pain every day, which limited the activities that he could do and had affected his stamina. (Tr. 300). He stated that his pain varied from a three to a seven out of ten and on his worst days, he was unable to do anything.

(Tr. 300). The claimant stated that he had these days about three or four days a week and was unable to do anything except alternate lying on the floor and walking for pain relief. (Tr. 305).

The claimant stated that he was on Celebrex for his arthritis, has a prescription for Ultram (though he did not take it because he does not like to use prescription drugs), and took three Tylenol daily in order to make the pain tolerable. (Tr. 300). The claimant also stated that he experienced some relief by stretching out his back, applying hot packs, and sitting in a whirlpool. (Tr. 301).

The claimant also stated that he experienced stabbing pain down the back of his right leg, especially when he was required to sit for a period of time, such as when driving a car. (Tr. 301). To combat this, he used a TENS unit and changed positions frequently. (Tr. 301-02). He also testified that he tried to avoid situations where he must sit or stand for long periods of time and was generally only able to sit for 15 minutes at a time. (Tr. 302). The claimant explained that after 15 minutes he must get up and walk around for 15 minutes and he spent his days alternating between the two positions. (Tr. 302). He also stated that his pain affected his ability to concentrate and focus. (Tr. 304).

As for household chores, the claimant testified that he mowed the grass, fed his horses, and occasionally helped his wife run their Bed and Breakfast by cleaning the house and doing dishes. (Tr. 303, 308).

The claimant testified that the prognosis for improvement in his back was not good. (Tr. 303). He noted that his doctors told him that there was nothing further that they could do for his back after his last surgery, barring any medical advancements. (Tr. 303).

The claimant testified that although he had been denied at two levels of Social Security because it was indicated that he could return to his purchasing agent job experience, Dr. Eggert had said that it would not be possible because it required a full day of sitting. (Tr. 305-06). The claimant also testified that he did not think that he would be

able to handle a full-time job because he would likely have to miss two to three days per week when his pain was at its worst. (Tr. 306).

The claimant's wife, Denise Thornton, also testified at the ALJ hearing. (Tr. 308-12). Ms. Thornton testified that she was in charge of all aspects of the Bed and Breakfast and the most the claimant was able to do to help was assist in setting the table for breakfast. (Tr. 309-10). She also testified that when the claimant was working, it rendered him unable to help out at the house and Ms. Thornton did all the chores and took care of the horses. (Tr. 310). She stated that she paid all the bills and fielded phone calls from the banker in order to keep stress away from her husband. (Tr. 311). Ms. Thornton also testified that the claimant had good and bad days and his bad days occurred about two times per week and were usually precipitated by the claimant trying to take on too much activity. (Tr. 311-12).

Finally, a vocation expert, Vanessa May, testified at the ALJ hearing. (Tr. 313-17). The ALJ proposed a hypothetical which contained the following restrictions: (1) lifting no more than 20 pounds occasionally and 10 pounds frequently; (2) sitting for six to eight hours a day with normal breaks; (3) standing or moving about for six to eight hours a day with normal breaks, preferably moving about; (3) able to walk up to one-half mile at a time, several times a day; (4) could occasionally bend, squat, crawl, stoop, climb stairs, and rarely climb ladders; (5) push or pull no more than 20 pounds; and (6) unable to work at heights or perform work which would required repeated looking up or to the extremes of right and left. (Tr. 314).

Ms. May testified that with those limitations the claimant would be able to return to his past work as a purchasing agent, as it is described in the Dictionary of Occupational Titles. (Tr. 314). She also testified that the claimant possessed transferable skills which allowed him to work in a number of light, skilled positions such as library assistant (DOT number 240.367-046, with 2,000 jobs in Iowa and 109,000 in the nation), transportation agent (DOT number 912.367-014, with 280 jobs in Iowa and 61,000 in the nation), or an

appliance parts sales clerk (DOT number 279.357-062, with 3,500 jobs in Iowa and 236,000 in the nation). (Tr. 314-15). Ms. May also testified that there were several light, unskilled occupations at which the claimant could work including an order clerk (DOT number 209.667-014, with 36,000 jobs in Iowa and 2,900,000 in the nation), a copy messenger (DOT number 239.677-010, with 1,200 jobs in Iowa and 118,000 in the nation), and a mail clerk (DOT number 209.687-026, with 1,300 jobs in Iowa and 152,000 in the nation). (Tr. 315).

The ALJ then asked Ms. May to explain the effect it would have on the claimant's ability to perform such work if he was unable to attend work because of back pain several days a week. (Tr. 316). In response, Ms. May testified that the claimant would not be able to perform any of the jobs she had listed. (Tr. 316).

On examination of Ms. May by the claimant's attorney, he proposed an alternate hypothetical, adding the following restrictions to the hypothetical proposed by the ALJ: (1) no prolonged sitting, including a ability to divide the day between 50% sitting and 50% standing or walking; (2) lifting no more than ten pounds; (3) ability to alternate tasks and change positions as needed; (4) no repetitive bending or twisting; (5) no crawling or climbing; (6) unable to work on uneven surfaces; (7) ability to work at a slow pace for up to a third of the workday due to pain, a need to shift positions, or loss of concentration. (Tr. 316). The claimant's counsel noted that these restrictions were taken from the Mayo Clinic's evaluation of the claimant's abilities. (Tr. 316).

Ms. May responded that there would be no competitive employment in which the claimant could participate if he had those limitations. (Tr. 317). Claimant's counsel then added a need to take unscheduled work breaks due to pack pain and/or depression at unspecified times other than the normal work breaks. (Tr. 317). To this, Ms. May responded that an employer would generally not allow for that kind of unscheduled breaks. (Tr. 317).

### III.  Conclusions of Law

### A.  Scope of Review

In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole.  See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989).  Substantial evidence is more than a mere scintilla.  It means relevant evidence a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986).  The court must take into account evidence which fairly detracts from the ALJ's findings.  Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987).  Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence."  Cruse, 867 F.2d at 1184 (quoting Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966)).  The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence.  Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

### B.  ALJ's Determination of Disability

Determining whether a claimant is disabled is evaluated by a five-step process.  See 20 C.F.R. § 404.1520(a)-(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The five steps are:

> (1) If the claimant is engaged in substantial gainful activity, disability benefits are denied.
> (2) If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe.  If the impairment is not severe, benefits are denied.
> (3) If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding

substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4) If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.

(5) If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (citing Bowen v. Yuckert, 482 U.S. at 140-42; 20 C.F.R. § 404.1520(a)-(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education, and work experience. Id.

Under the first step of the analysis, the ALJ determined that the claimant had not engaged in substantial gainful employment since his alleged onset date of June 21, 2001. At the second step, the ALJ found that the claimant was impaired by status-post C6-7 discectomy and fusion, status-post L5 laminectomy and disc excision, carpel tunnel syndrome, and headaches, which he determined were severe. At the third step, the ALJ determined that the claimant's impairments were not equivalent to one of the listed impairments. At the fourth step, the ALJ determined the claimant had the following residual functional capacity (RFC):

[T]o perform work which requires occasionally lifting 20 pounds and frequently lifting 10 pounds, but not above the

shoulder level; sitting about 6 hours in an 8-hour workday with normal breaks; standing about 6 hours in an 8-hour workday with normal breaks; walking up to ½ mile several times per day; occasionally bending, squatting, crawling, stooping and climbing stairs, but rarely climbing ladders; pushing or pulling no more than 20 pounds; avoiding working at heights or repeatedly looking up or looking to the extremes of left and right.

The ALJ determined that the claimant was able to perform his past relevant work as a purchasing agent. Based on his RFC, the ALJ determined that the claimant had transferable skills and was able to perform work which exists in a significant number in the national economy, including a library assistant, transport agent, appliance part sales clerk, order clerk, copy messenger, and mail clerk. Therefore the ALJ determined that the claimant was not under a disability at any time through the date of his decision.

## C.  Weight Given to Claimant's Treating Physician

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight.  A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted).  The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. See 20 C.F.R. § 404.1527(d)(2). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).

The claimant argues that the ALJ erred in discounting a portion of the opinion of Dr. Bihn, one of the claimant's treating physicians.  In addition, the claimant argues that the ALJ failed to even acknowledge the rejection of this portion of Dr. Bihn's opinion, much less provide specific reasons for doing so.

It appears from the record that Dr. Bihn was one of the claimant's treating physicians from March 2001 to January 2002, and it appears that she had also seen the claimant following his 1988 discectomy. During that period of time Dr. Bihn saw the claimant on twelve occasions and performed numerous MRIs and other objective medical tests. On November 29, 2001, Dr. Bihn suggested that the claimant was in a light to medium physical capacity and suggested limiting his lifting to 35 pounds maximum. However, after extensive testing was performed in the Industrial Rehabilitation Center, Dr. Bihn added the following limitations on January 18, 2002: (1) maximum lift of 30 pounds; (2) rare elevated work; (3) rare forward bending while sitting; (4) rare forward bending while standing; (5) rare rotational sitting; (6) rare rotational standing; (7) rare repetitive squatting; and (8) occasional sitting and standing. Dr. Bihn noted that she agreed with the limitations that the Industrial Rehabilitation Center had found. It is noted that on the claimant's IRC evaluation "rarely" is defined as 1-5% of a workday and "occasionally" is defined as 6-33% of a workday.

In his decision, the ALJ stated that he gave "greater weight" to the opinion of Dr. Bihn, due to her long history of care for the claimant. However, in his RFC, the ALJ adopted different limitations for the claimant's ability to sit and stand and completely ignored other limitations placed on the claimant by Dr. Bihn. The ALJ found that the claimant had the residual functional capacity to stand for six hours in an eight-hour workday and stand for six hours in an eight hour workday with normal breaks. However, Dr. Bihn stated that the claimant should be limited to sitting or standing for only 6-33% of a workday, not the 66% that the ALJ found that the claimant can withstand. In addition, the ALJ completely ignores Dr. Bihn's opinion that the claimant should be limited to rare forward bending while sitting or standing and rare rotation while sitting or standing. The ALJ does not acknowledge these differences between Dr. Bihn's opinion and the ALJ's RFC determination. Nor does the ALJ point to another treating source's opinion which falls in line with his RFC findings.

The defense argues that the ALJ properly gave credit to Dr. Bihn's November 2001 findings, not Dr. Bihn's January 2002 findings. However, there is nothing in the ALJ's decision to lend support to this conclusion.

"It is well established that an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record." Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000) (citing Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999); Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)). Nowhere in the ALJ's opinion does he explain how any evidence in the record conflicts with the portions of Dr. Bihn's opinion to which he failed to give credit.

In addition, the defense argues that the ALJ properly rejected the opinions of Drs. Eggert and Smith. While this may be true, this is not an argument that is posed by the claimant. The claimant asserts Dr. Bihn's opinion should not be rejected piecemeal because it is supported by the opinions of Drs. Eggert and Smith. The ALJ is free to give no credit to the opinions of Dr. Eggert and Dr. Smith, however, once the ALJ has rejected the opinions of Drs. Eggert and Smith he is left with Dr. Bihn's opinion, which he partially rejected. The Eighth Circuit has held that the ALJ must not substitute his opinions for those of physicians. Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990) (citing Fowler v. Bowen, 866 F.2d 249, 252 (8th Cir. 1989)). In the absence of adopting another treating source's opinion or objective medical evidence into his RFC, the ALJ has substituted his opinion for that of Dr. Bihn.

This court finds that the ALJ erred in discounting a portion of the claimant's treating source's opinion as to his limitations and erred by failing to give adequate reasons why he discounted this portion. Thus, a remand is necessary for a proper determination of the claimant's RFC and a detailed explanation as to what evidence in the record supports the ALJ's conclusion.

## D.  Subjective Allegations of Pain

The claimant argues that the ALJ improperly discredited his subjective allegations of pain.  When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  "The [ALJ] is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations."  Id.  In evaluating claimant's subjective impairment, the following factors are considered:  (1) the applicant's daily activities; (2) the duration, frequency and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.  Id. at 1321-22.  Subjective complaints may be discounted if inconsistencies exist in the evidence as a whole.  Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir. 1994); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  Where the ALJ seriously considers, but for good reason explicitly discredits a plaintiff's subjective complaints, the court will not disturb the ALJ's credibility determination.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

The ALJ, in discrediting the claimant's credibility as to his subjective allegations of pain, stated:

> The undersigned accepts as credible the testimony of the claimant to the extent that he has had multiple surgeries to his spine with residual effects.  However, in spite of his allegations of constant pain, the claimant has gone for extended periods of time without the need for prescription pain medication and he is able to relieve his symptoms with conservative measures.  In addition, the claimant's daily activities have remained remarkably unchanged with or without the use of prescribed pain medication.  Further, the undersigned is inclined to find that the claimant would be working for 3M if a position meeting his restrictions had been available; however, without the availability of a position with his former employer, the claimant has investigated other vocational opportunities.  Therefore, the undersigned finds the claimant's assertions as to his physical limitations are not

supported by the evidence of record and, therefore, not fully credible.

The claimant argues that the ALJ's finding that the claimant was not on prescription medication is not supported by the record. The claimant was started on Flexeril in March 2001 by Dr. Bihn. (Tr. 227). In April 2001, Dr. Bihn added Celebrex for the claimant's increased pain. (Tr. 225). In June 2001, Dr. Bihn prescribed a Medrol Dosepak for pain relief. (Tr. 220). The claimant underwent cervical epidural steroid injections in July 2001, which did not provide him with much relief. (Tr. 218, 233). In February 2003 the claimant noted that he was taking Ultram, in addition to Aleve, Ibuprofin, and Tylenol. (Tr. 137). In June 2003, the claimant stated that he was taking Celebrex daily and Ultram as needed. (Tr. 149). The claimant was also prescribed a TENS unit in March 2004 by Dr. Eggert. (Tr. 271). Finally, the claimant was given a prescription of Nortriptyline in November 2004, which was increased in December. (Tr. 280, 289). Thus, this court finds that the ALJ's determination that the claimant has gone without the need for prescription pain medication is not supported by the record as a whole and cannot be used a reason for discrediting the claimant's subjective allegations of constant pain.

The ALJ also asserts that the claimant is able to relieve his symptoms with conservative measures. While the claimant testified that he get some relief from stretching, walking, heat packs, and a whirlpool, it does not appear from the record that these measures entirely relieve his pain.

Finally, the ALJ states that because the claimant has stated that he would be working if 3M was able to provide a job tailored to his restrictions, and because, failing this, he began to look for other vocational opportunities, this compromises the claimant's credibility. These facts seem to buttress the claimant's credibility by showing that he is not simply seeking benefits when he could be working. The claimant has continued to look for a job that he would be able to perform given his limitations, and has repeatedly been unable to find such a vocation. The fact that the claimant has expressed a desire to return to work in some form does not discredit his allegations of pain.

This court finds that the ALJ's determination that the claimant's subjective assertions of pain are discredited is not supported by substantial evidence in the record as a whole.

Upon the foregoing,

IT IS ORDERED that this case be remanded for a proper residual function capacity assessment that incorporates the opinion of one of the claimant's treating sources and the claimant's subjective allegations of pain.

May 15, 2006.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT